KANSANS FOR LIFE, INC., Plaintiff,

v.

Diane GAEDE, in her official capacity as Chairwoman and Member of the Kansas Governmental Ethics Commission, et al., Defendants.

No. 98–4192–RDR.

United States District Court,
D. Kansas.

Feb. 24, 1999.

Frederick J. Patton, Patton & Patton, Topeka, KS, James Bopp, Jr, James R Mason, III, Bopp, Coleson & Bostrom, Terre Haute, IN, for plaintiff.

Eliehue Brunson, Office of Attorney General, Topeka, KS, for defendants.

## *MEMORANDUM AND ORDER*

ROGERS, District Judge.

This case is now before the court upon plaintiff's motion for preliminary injunction, defendant's motion to dismiss and plaintiff's motion to combine the hearing upon the preliminary injunction motion with the trial on the merits.

## BACKGROUND

Plaintiff is a nonprofit Kansas corporation exempt from federal income tax. It promotes "pro-life" issues and attempts to educate the general public regarding such issues from a "pro-life" perspective. It is not associated with any political candidate or political party. Defendants are officers of the Kansas Governmental Ethics Commission. The Commission is charged with enforcing certain provisions of the Kansas Campaign Finance Act, K.S.A. 25–4142 *et seq.* The enforcement policy of the Commission is being challenged by plaintiff in this lawsuit. The defendants are being sued in their official capacities.

In July 1998, during the primary campaign to determine the Republican Party's candidate for Governor of Kansas, plaintiff ran a radio advertisement. The ad read as follows:

Have you ever had someone try to trick you? You know, twist the truth to make you think one thing instead of another? Children are quite good at this. Unfortunately, Governor Bill Graves is trying to do the same thing, telling you he is pro-life when, in fact, he is a strong supporter of legal abortion in Kansas. During his last campaign, Gov. Bill Graves held a rally for his supporters— Dr. George Tiller, the infamous late-term abortionist was in attendance to support Bill Graves. We know Bill Graves props up the abortion industry because we are Kansans For Life—it's our job to know who is pro-life and who is pro-abortion. Yet there are political ads, which this radio station is required by law to run, by Bill Graves trying to deceive you. The truth is David Miller, who is challenging Bill Graves for Governor, is pro-life. David Miller has always been pro-life. David Miller will not change or try to fool you just because it is an election. Now you know the truth!

Paid for by Kansans For Life.

The ad cost $750.00 which was covered in part from the general operating funds of plaintiff and from an in-kind contribution to it from a private individual. The Commission received an anonymous complaint that the ad should have been paid for by plaintiff's political action committee under the Kansas Campaign Finance Act because the ad expressly advocated the election or defeat of a clearly identified candidate. A staff member of the Commission informed plaintiff of the complaint and suggested that plaintiff seek an advisory opinion from the Commission on this matter. Plaintiff followed this advice. Consequently, the Commission reviewed the July ad and concluded in Advisory Opinion 1998–22 that the July advertisement constituted express advocacy of the election or defeat of a candidate and, therefore, was subject to the disclosure requirements of the Kansas Campaign Finance Act.

On November 4, 1998, plaintiff filed this case and asked for a temporary restraining order against the application of the Kansas Campaign Finance Act, as construed by the advisory opinion, against the July ad and future "issue advocacy" political advertisements by plaintiff. On November 6, 1998, the Commission mailed a notice of failure to file a receipts and expenditures report required by the Kansas Campaign Finance Act. The notice stated:

A review of the files in the Secretary of State's Office indicates that you have failed to file the October 26, 1998 Receipts and Expenditures Report For A Person Other Than A Candidate, Party Committee or Political Committee as required by law. Such report, a blank copy of which is enclosed for your use, must be completed and filed within five (5) days from the date of receipt of this notice.

As provided by K.S.A. 25–4181, the Commission may assess a civil fine against Kansans For Life in an amount not to exceed $5,000 for the first viola-

tion, $10,000 for the second violation and $15,000 for the third violation.

File the required report within five (5) days with the Secretary of State.

As stated, the notice gave plaintiff five days to file the report. The report lists who made an expenditure on behalf of a political candidate. In this instance, the report required the disclosure of what individual and organization paid for the July 1998 radio ad. On November 10, 1998, the court conducted a hearing upon plaintiff's motion for a temporary restraining order. The focus of the TRO hearing was the deadline for filing the receipts and expenditures report. Ultimately, however, the court did not rule upon the motion and allowed defendants additional time to respond to it. On November 12, 1998, plaintiff filed the receipts and expenditures report. A few days later an amended report was filed.

If the report had not been filed, then a staff member of defendant would have filed a complaint. The Commission would have reviewed the complaint for sufficiency. There would have been an investigation and a determination of probable cause and then a public hearing. The Commission would have made findings which may have led to a fine or even criminal prosecution by the Attorney General.

Plaintiff's filing of the report arguably eliminated some of the urgency for injunctive relief. But, the time for Wichita city elections is approaching. Plaintiff intends to run political advertisements for that election. Now, plaintiff argues that injunctive relief is necessary in this case to prevent its rights from being violated both as to the July 1998 advertisement (because the report is still on file and open to the public) and as to future advertisements. Defendants have filed a motion to dismiss.

OPERATION OF THE STATUTE

The Kansas Campaign Finance Act requires a receipts and expenditures report by persons other than a candidate or candidate committee, or party or political

committee, regarding the funding of political advertisements when the advertisements are considered "contributions" for a certain candidate. K.S.A. 25–4150. If the advertisement "expressly advocates the nomination, election or defeat of a clearly identified candidate," then it is a "contribution" under K.S.A. 25–4143(e)(1)(B). The report must contain the name and address of each person from whom a contribution or in-kind contribution in excess of $50 was made. K.S.A. 25–4148(b)(2) & (8).

The statute further provides at 25–4143(h) that "expressly advocate" means:

> "any communication which uses phrases including, but not limited to: (A) 'Vote for secretary of state'; (B) 'reelect your senator'; (C) 'support the democratic nominee'; (D) 'cast your ballot for the republican challenger for governor'; (E) 'Smith for senate'; (F) 'Bob Jones in '98'; (G) 'vote against Old Hickory'; (H) 'defeat' accompanied by a picture of one or more candidates; or (I) 'Smith's the one.' "

## THE ADVISORY OPINION

The July ad contained none of the "buzz" words specified in the statute as express advocacy. But, the advisory opinion from the Commission (Advisory Opinion 1998–22) found that it constituted express advocacy which triggered the reporting requirement because if read "on the whole" by an ordinary person it would lead that person to believe he or she was being urged to vote for a particular candidate. Specifically, the advisory opinion applied the following definition of express advocacy to the July ad:

> A communication which, when viewed as a whole, leads an ordinary person to believe that he or she is being urged to vote for or against a particular candidate for office, will be deemed to expressly advocate the nomination, election or defeat of a clearly identified candidate.

## PLAINTIFF'S COMPLAINT

The complaint in this case has two claims. The first claim ("Count One") involves relief directed toward the July advertisement. The second claim ("Count Two") involves relief directed toward future advertisements.

Plaintiff asks that the court issue a declaratory judgment that the July ad was "issue advocacy" protected under the First Amendment from regulation; that the enforcement policy enunciated in Advisory Opinion 1998–22 be declared unconstitutional; that the Commission expunge the report filed by plaintiff regarding the July ad; and that defendants be enjoined from enforcing the alleged unconstitutional policy stated in the advisory opinion against future advertisements.

## DEFENDANTS' POSITION

Defendants' motion to dismiss contends: 1) that there is no case and controversy because plaintiff's filing of the report has made any controversy regarding the July 1998 ad moot; 2) that there is no case and controversy regarding future political ads because any issue regarding those ads is not ripe for decision; and 3) that the court should abstain from deciding plaintiff's claims in this matter. Defendants also contend that the July ad is not issue advocacy and that the enforcement policy stated in Advisory Opinion 1998–22 is constitutional.

## DISCUSSION

*Consolidation of hearing with trial on the merits*

Plaintiff moved to consolidate the trial on the merits in this case with the hearing upon the preliminary injunction motion. Defense counsel at first opposed this idea. However, when the issue was raised again at the close of the hearing upon the instant motions, defense counsel appeared to approve consolidation. The court believes consolidation would be logical and efficient. Therefore, the court shall grant the motion for consolidation and consider this order to be the final order on the merits in this case.

*Mootness*

 Defendants assert that there is no case and controversy regarding Count One of plaintiff's complaint (the July ad) because: plaintiff filed the report; any information contained in the report is now a matter of public record; and no further proceedings will be taken against plaintiff with regard to the July ad. Defendants make reference to *Cox v. Phelps Dodge Corp.,* 43 F.3d 1345 (10th Cir.1994). There, the Tenth Circuit stated:

> The touchstone of the mootness inquiry is whether the controversy continues to "touch[ ] the legal relations of parties having adverse legal interests" in the outcome of the case. *DeFunis v. Odegaard,* 416 U.S. 312, 317, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) ... This "legal interest" must be more than simply the satisfaction of a declaration that a person was wronged. *Ashcroft v. Mattis,* 431 U.S. 171, 172–72, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977).

43 F.3d at 1348.

The court believes a legal interest is still at stake with regard to Count One and the July ad. Plaintiff has asked for expungement of the report which is on file with the public. Case law recognizes that a legal request for expungement may create a sufficient controversy to avoid dismissal for alleged mootness. See *Kerr v. Farrey,* 95 F.3d 472, 476 (7th Cir.1996) (request for expungement of misconduct references from prison records is not made moot by prisoner's parole); *Paton v. LaPrade,* 524 F.2d 862, 868 (3rd Cir.1975) (plaintiff may ask for expungement of information gathered by FBI in violation of plaintiff's First Amendment rights, although file and investigation are closed); *Black v. Warden,* 467 F.2d 202, 204 (10th Cir.1972) (case may not be dismissed as moot until plaintiff's disciplinary records are expunged).

Case law also states that the mootness doctrine is not applied strictly to First Amendment cases, particularly when it is difficult to fully consider a promptly-filed case prior to the event (such as an election) which arguably renders the case moot and when the issue is capable of repetition. See *New Hampshire Right to Life v. Gardner,* 99 F.3d 8, 18 (1st Cir. 1996). In this instance, the letter from the Commission which ordered plaintiff to file the report at issue gave plaintiff *five* days to do so. That is not much time to litigate whether the order is legal prior to the Commission filing a complaint which could lead to a civil fine or criminal penalty. Furthermore, it is evident that this is an issue which is capable of repetition.

To summarize, the court finds that plaintiff has asserted a real and substantial controversy with regard to Count One. Plaintiff contends that it was unconstitutionally forced to file a report revealing the source of money for issue advocacy protected from regulation by the First Amendment and that the information continues on file for public inspection. Plaintiff further alleges an interest in withholding the information and expunging the report. Accordingly, we reject defendants' mootness argument.

*Ripeness*

 Defendants contend that any claim regarding future ads is not ripe for decision because there is no indication: that plaintiff will do ads; that the ads will be considered express advocacy; or that defendant will direct that a receipt and expenditures report be filed with regard to the ads. In other words, defendants insist that any issue regarding future ads (Count II of this case) is anchored on future events that may not happen and therefore is not ripe for decision.

The Tenth Circuit discussed the standards relating to ripeness in a First Amendment case in *New Mexicans for Bill Richardson v. Gonzales,* 64 F.3d 1495, 1499–1500 (10th Cir.1995):

> In order for a claim to be justiciable under Article III, it must be shown to be a ripe controversy. "[R]ipeness is peculiarly a question of timing," *Regional Rail Reorganization Act Cases,* 419 U.S.

102, 140, 95 S.Ct. 335, 357, 42 L.Ed.2d 320 (1974), intended "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements," *Abbott Labs. v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). In short, the doctrine of ripeness is intended to forestall judicial determinations of disputes until the controversy is presented in "'clean-cut and concrete form.'" *Renne,* 501 U.S. at 322, 111 S.Ct. at 2339 (quoting *Rescue Army v. Municipal Court of Los Angeles,* 331 U.S. 549, 584, 67 S.Ct. 1409, 1427, 91 L.Ed. 1666 (1947)).

As a general rule, determinations of ripeness are guided by a two-factor test, "'requiring us to evaluate both the fitness of the issue for judicial resolution and the hardship to the parties of withholding judicial consideration.'" *Sierra Club v. Yeutter,* 911 F.2d 1405, 1415 (10th Cir.1990) (quoting *Abbott Labs. [v. Gardner],* 387 U.S. [136] at 149, 87 S.Ct. [1507] at 1515 [, 18 L.Ed.2d 681 (1967)]). In determining whether an issue is fit for judicial review, the central focus is on "whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." 13A Wright, Miller & Cooper, Federal Practice & Procedure, § 3532 at 112. To this end, courts frequently focus on whether a challenged government action is final and whether determination of the merits turns upon strictly legal issues or requires facts that may not yet be sufficiently developed. See *Sierra Club,* 911 F.2d at 1415; *El Dia, Inc. v. Hernandez Colon,* 963 F.2d 488, 495 (1st Cir.1992). In assessing the hardship to the parties of withholding judicial resolution, our inquiry "'typically turns upon whether the challenged action creates a "direct and immediate" dilemma for the parties.'" *El Dia,* 963 F.2d at 495 (quoting *W.R. Grace & Co. v. United States EPA,* 959 F.2d 360, 364 (1st Cir.1992)).

The customary ripeness analysis outlined above is, however, relaxed somewhat in circumstances such as this where a facial challenge, implicating First Amendment values, is brought. E.g., *ACORN,* 835 F.2d at 739; *Martin Tractor Co. v. Federal Election Comm'n,* 627 F.2d 375, 380 (D.C.Cir.), *cert. denied,* 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 218 (1980). Thus, while it is true that "the mere existence of a statute ... is ordinarily not enough to sustain a judicial challenge, even by one who reasonably believes that the law applies to him and will be enforced against him according to its terms," *National Student Ass'n v. Hershey,* 412 F.2d 1103, 1110 (D.C.Cir.1969), in the context of a First Amendment facial challenge, "[r]easonable predictability of enforcement or threats of enforcement, without more, have sometimes been enough to ripen a claim," *Martin Tractor,* 627 F.2d at 380. See also *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298–99, 99 S.Ct. 2301, 2308–09, 60 L.Ed.2d 895 (1979). The primary reasons for relaxing the ripeness analysis in this context is the chilling effect that potentially unconstitutional burdens on free speech may occasion:

> First Amendment rights of free expression and association are particularly apt to be found ripe for immediate protection, because of the fear of irretrievable loss. In a wide variety of settings, courts have found First Amendment claims ripe, often commenting directly on the special need to protect against any inhibiting chill.

13A Wright, Miller & Cooper, Federal Practice and Procedure S 3532.3 at 159, see also *ACORN,* 835 F.2d at 740.

In this case, defendants have not disavowed the policy enunciated in Advisory Opinion 1998–22. Quite the contrary, defense counsel have affirmed that the advisory opinion represents the defendants' official enforcement policy. Furthermore, in contrast to *Wisconsin Right to Life v.*

*Paradise,* 138 F.3d 1183 (7th Cir.1998), defendants have recently applied the policy to plaintiff. Plaintiff has also stated in its verified complaint that it wants to continue making political advertisements in the nature of "issue advocacy" but fears the application of the allegedly ambiguous enforcement policy to such ads. ¶¶ 41, 46 Amended Verified Complaint. The court believes it would be a hardship to require plaintiff to produce the advertisements it intends to make for the inspection of a court or the Commission prior to this court finding that there was a case and controversy ripe for the court's decision. After considering the hardship upon plaintiff and defendants, the alleged chilling effect under the current enforcement policy and the fitness of this matter for review, the court shall reject defendants' ripeness challenge. See *Vermont Right to Life Committee, Inc. v. Sorrell,* 19 F.Supp.2d 204, 210–11 (D.Vt.1998).

*Abstention*

Defendants assert that this court should abstain from exercising jurisdiction in this case. The Supreme Court has stated that "Abstention is ... the exception and not the rule, and we are particularly reluctant to abstain in cases involving facial challenges based on the First Amendment." *Houston v. Hill,* 482 U.S. 451, 467, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987). This case is not a facial challenge to a statute; it's a challenge to how a statute has been applied in the past and may be applied in the future. Nevertheless, we take some instruction from these comments.

At the hearing upon plaintiff's application for a temporary restraining order, the court suggested that *Younger* abstention deserved consideration in this case. But, at that time, there was arguably a state administrative enforcement proceeding being initiated against plaintiff. The court may have interfered with it if an injunction had issued. There is no such administrative proceeding at the present time. Therefore, *Younger* abstention is not an issue. See *Middlesex County Ethics Com-*

*mittee v. Garden State Bar Ass'n,* 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (ongoing state proceedings are a necessary premise for *Younger* abstention).

Nor will this court apply the *Burford* and *Pullman* abstention doctrines to these facts.

*Burford* abstention arises when a federal district court faces issues that involve complicated state regulatory schemes. Under *Pullman* abstention, a district court should abstain if three conditions are satisfied: (1) an uncertain issue of state law underlies the federal constitutional claim; (2) the state issues are amenable to interpretation and such an interpretation obviates the need for or substantially narrows the scope of the constitutional claim; and (3) an incorrect decision of state law by the district court would hinder important state law policies.

*Lehman v. City of Louisville,* 967 F.2d 1474, 1478 (10th Cir.1992). This case does not involve state law issues which are connected to complicated state regulatory schemes. It presents a straightforward First Amendment question. Therefore, *Burford* abstention is not appropriate. *Pullman* abstention is a closer question. However, in this case where plaintiff is exercising its right to bring a claim under 42 U.S.C. § 1983 in federal court and the delay from abstention would perpetuate the alleged chilling effect on First Amendment rights, the court does not believe *Pullman* abstention should be invoked. See *Bad Frog Brewery v. New York State Liquor Authority,* 134 F.3d 87, 93–94 (2nd Cir.1998); *Clajon Production Corp. v. Petera,* 70 F.3d 1566, 1576 (10th Cir.1995).

For these reasons, the court rejects abstention.

*Count One*

Plaintiff asserts that the requirement to file the receipts and expenditures report disclosing the source of money for the July advertisement violated the right

to free speech and association guaranteed by the First Amendment. The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech ... or the right of the people peaceably to assemble." U.S. CONST. Amend. I. The Fourteenth Amendment protects these rights against infringement by the State government. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 336 n. 1, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). The protections of the First Amendment have been construed broadly " 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' " *Buckley v. Valeo*, 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) quoting, *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). " '[D]ebate on public issues should be uninhibited, robust, and wide-open.' " *Id.*, quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

The right of association is connected to the right of speech protected by the First Amendment. *Buckley*, 424 U.S. at 75, 96 S.Ct. 612. In *Buckley*, where the Supreme Court reviewed the constitutionality of a federal campaign finance statute which required the disclosure of contributors under certain circumstances, the Court stated:

"we have repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." [citing five Supreme Court cases].

. . . .

[G]roup association is protected because it enhances '[e]ffective advocacy.' *NAACP v. Alabama, supra,* [357 U.S. 449] at 460[, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)]. The right to join together 'for the advancement of beliefs and ideas,' *ibid.,* is diluted if it does not include the right to pool money through contributions, for funds are often essential if 'advocacy' is to be truly or optimally 'effective.' Moreover, the invasion of privacy of belief may be as great when the information sought concerns the giving and spending of money as when it concerns the joining of organizations, for '[f]inancial transactions can reveal much about a person's activities, associations, and beliefs.' *California Bankers Assn. v. Shultz,* 416 U.S. 21, 78–79, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974) (Powell, J., concurring)."

424 U.S. at 64–66, 96 S.Ct. 612. The Court acknowledged that disclosure requirements served legitimate governmental interests in informing the public of the source of financial support for political discourse, deterring corruption and maintaining records necessary to detect violations of contribution limits. 424 U.S. at 67–68, 96 S.Ct. 612. But, the Court further found that disclosure "will deter some individuals who otherwise might contribute" and "in some instances ... may even expose contributors to harassment or retaliation." 424 U.S. at 68, 96 S.Ct. 612. Finding that "[t]hese are not insignificant burdens of individual rights," the Court narrowly limited the type of expression subject to disclosure requirements. Hence, the disclosure requirements were limited to funds paid "for communications that expressly advocate the election or defeat of a clearly identified candidate." 424 U.S. at 80, 96 S.Ct. 612. The Court listed examples of such "express advocacy" as communications using words "such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.' " 424 U.S. at 44 n. 52, 96 S.Ct. 612.

Ten years after *Buckley*, in *Federal Election Commission v. Massachusetts Citizens For Life, Inc.*, 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) ("MCFL"), the Court generally reaffirmed *Buckley*. The Court made clear that *Buckley* contemplated that not only a discussion of issues but also a discussion of candidates could qualify as "issue advocacy"; the line was drawn at "more pointed exhortations to vote for particular per-

sons." 479 U.S. at 249, 107 S.Ct. 616. In *MCFL*, the Court found this line was crossed by a voting guide which contained the exhortation "VOTE PRO–LIFE" and listed candidates who had pro-life voting records. That constituted express advocacy.

To reiterate, the July ad at issue in this case contains none of the "buzz" words or phrases which the Supreme Court or the Kansas Legislature have listed as trademarks of "express advocacy." It does not expressly exhort the listener to vote for, elect or support one candidate or another. A reasonable and ordinary person would *imply* from the ad that plaintiff favors one candidate over the other. But, the ad does not *expressly* advocate the election or defeat of a candidate or direct the public to take action for or against an identified candidate. The ad contrasts the positions of two candidates on the issue of abortion and asserts that one candidate is honestly stating his position on the issue while the other candidate is not. Thus, the ad discusses an issue while disparaging one candidate and commending his opponent. However, the question of whether a candidate's ads are truthful and whether a candidate is candidly stating his positions during a campaign are very common "issues" in an election season. Those issues are the subjects of the message. Because the ad addresses those issues without expressly advocating the election or defeat of a candidate, the court finds that it was unconstitutional for defendants to regulate this speech by directing that a report be filed which discloses who paid for the communication.[1]

As discussed earlier, the court does not believe this matter is moot. Maintaining the report on file perpetuates the potentially chilling disclosure which the Court in *Buckley* found can infringe on the privacy of association and belief guaranteed by the First Amendment. 424 U.S. at 64, 96 S.Ct. 612. The court is aware of no government interest which in this instance would justify maintaining the disclosure of information collected in violation of the First Amendment. Accordingly, the court shall direct defendants to ask the Kansas Secretary of State to expunge the report filed by plaintiff from the public records. See *Doe v. U.S. Air Force*, 812 F.2d 738, 741 (D.C.Cir.1987) (federal court has power to order expungement where necessary to vindicate Constitutional rights even if files are closed and scheduled for destruction).

### Count Two

▮ In Count Two of the complaint, plaintiff asks for an injunction against application of the enforcement policy stated in Advisory Opinion 1998–22 and a declaration that the policy is unconstitutional. The court shall grant the requested relief.

Counsel for defendants have acknowledged that Advisory Opinion 1998–22 represents the official enforcement policy of the Commission. To repeat, "express advocacy" is defined in the Advisory Opinion as:

> A communication which, when viewed as a whole, leads an ordinary person to believe that he or she is being urged to vote for or against a particular candidate for office . . .

---

1. A similar conclusion was reached by the Tenth Circuit in *Federal Election Commission v. Colorado Republican. Federal Campaign Committee*, 59 F.3d 1015, 1023 n. 10 (10th Cir.1995) *vacated on other grounds*, 518 U.S. 604, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996). There, the court held that, "although it comes close" the following advertisement was not express advocacy within the "narrow definition" of *Buckley* and *MCFL:*

> Here in Colorado we're used to politicians who let you know where they stand,

and I thought we could count on Tim Wirth to do the same. But the last few weeks have been a real eye-opener. I just saw some ads where Tim Wirth said he's for a strong defense and a balanced budget. But according to his record, Tim Wirth voted against every major new weapons system in the last five years. And he voted against the balanced budget amendment.

> Tim Wirth has a right to run for the Senate, but he doesn't have a right to change the facts.

This is an unconstitutionally vague standard.

Under this standard, if reasonable people could disagree whether the communication urges a vote for or against a particular candidate, then the message is subject to the regulatory disclosure requirements applicable to express advocacy. This is contrary to the *Buckley* Court's constitutionally mandated narrow, unambiguous and explicit definition of the term for the purposes of the federal campaign finance statute. It is also contrary to how *Buckley* has been construed by other courts and the Federal Election Commission (FEC).

One approach to defining "express advocacy" has focused on use of the "buzz" words or "magic" words listed in the *Buckley* opinion. E.g., *Faucher v. Federal Election Commission*, 928 F.2d 468, 470 (1st Cir.) *cert. denied*, 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991). Another arguably broader definition was employed by the Ninth Circuit in *Federal Election Commission v. Furgatch*, 807 F.2d 857, 864 (9th Cir.) *cert. denied*, 484 U.S. 850, 108 S.Ct. 151, 98 L.Ed.2d 106 (1987). There, the court permitted consideration of contextual factors:

> We conclude that speech need not include any of the words listed in *Buckley* to be express advocacy under the Act, but it must, when read as a whole, and with limited reference to external events be susceptible to no other reasonable interpretation but as an exhortation to vote for or against a specific candidate.

To the Ninth Circuit this meant that: the language had to be "unmistakable and unambiguous, suggestive of only one plausible meaning"; it must present a "clear plea for action"; and "it must be clear what action is advocated." *Id.* The regulations of the FEC attempt to follow the Ninth Circuit approach. 11 C.F.R. § 100.22. However, these regulations have been attacked successfully in other circuits as unconstitutionally vague. *Right to Life of Dutchess County, Inc. v. Federal Election Commission*, 6 F.Supp.2d 248 (S.D.N.Y.1998); *Maine Right to Life Committee, Inc. v. Federal Election Commission*, 914 F.Supp. 8 (D.Maine) *aff'd per curiam*, 98 F.3d 1 (1st Cir.1996) *cert. denied*, —— U.S. ——, 118 S.Ct. 52, 139 L.Ed.2d 17 (1997); *Federal Election Commission v. Christian Action Network*, 894 F.Supp. 946 (W.D.Va.1995), *aff'd per curiam*, 92 F.3d 1178, 1996 WL 431996 (4th Cir.1996).

The enforcement policy described in the advisory opinion at issue does not conform with any of the approaches described above. It does not restrict regulation to advertisements which use certain "buzz" words. Nor does it restrict regulation to advertisements which can *only* be reasonably interpreted as advocating the election or defeat of a candidate; which contain a clear plea to action; and which are unmistakable and unambiguous.

In summary, plaintiff has established a realistic danger that defendants will apply an unconstitutionally vague and overbroad enforcement policy against issue advocacy by plaintiff that is protected by the First Amendment. Therefore, the court shall enjoin defendants from applying that enforcement policy against plaintiff in the future and declare that the policy is unconstitutional.[2]

*Injunction Standards*

In order for the court to grant a permanent injunction, plaintiff must satisfy the standards for a preliminary injunction, except for a permanent injunction plaintiff must show actual success on the merits. *Amoco Prod. Co. v. Village of Gambell,*

---

**2.** As noted, there is a split among courts as to what definition of express advocacy satisfies constitutional muster. Because the enforcement policy of defendants violates any definition approved by other courts, the court does not believe it is necessary in this opinion to endorse one definition or another. Rather than engage in such dicta and unnecessarily interpret state law, the court shall leave the task of developing a different definition of express advocacy to the agents of the State.

**938**

*Alaska,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). Here, plaintiff has sufficiently proven a chilling effect upon its First Amendment rights. This constitutes irreparable harm. *Elam Construction, Inc. v. Regional Transportation District,* 129 F.3d 1343, 1347 (10th Cir. 1997). The public interest favors the assertion of First Amendment rights and we believe this outweighs the interests served by regulating the kind of speech at issue in this case. *Id.* Finally, for the reasons previously stated, the court finds that plaintiff has demonstrated actual success on the law and the facts of this case. Consequently, the court shall enter a permanent injunction in this case.

CONCLUSION

Plaintiff's motion for consolidation of the hearing on the motion for a preliminary injunction and the trial on the merits is granted. Defendants' motion to dismiss is denied. The court hereby declares that plaintiff's July 1998 radio advertisement constituted issue advocacy protected from regulation by the State of Kansas under the First and Fourteenth Amendments to the Constitution. The court hereby directs defendants to request that the receipts and expenditures reports filed by plaintiff at defendants' behest with regard to the July 1998 radio advertisement be expunged from the public records of the Secretary of State. The court further declares that the enforcement policy based upon the definition of express advocacy contained in defendants' Advisory Opinion 1998–22 is unconstitutionally vague and enjoins defendants from applying that policy against plaintiff in the future.

**IT IS SO ORDERED**